UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| MATTHEW DEAN MRAZ, | ) | Case No. 4:19-CV-02410 |
|  | ) |  |
| Plaintiff, | ) | JUDGE PEARSON |
|  | ) |  |
| -vs- | ) | MAGISTRATE JUDGE |
|  | ) | CARMEN E. HENDERSON |
| ANDREW SAUL, COMMISSIONER | ) |  |
| OF SOCIAL SECURITY, | ) |  |
|  | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) |  |
|  | ) |  |

## I. Introduction

Plaintiff, Matthew Dean Mraz ("Mraz" or "Plaintiff"), seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Mraz's application for DIB be affirmed.

## II. Procedural History

On June 11, 2016, Mraz filed a Title II application for a period of disability and disability benefits beginning March 17, 2016. The Commissioner of Social Security denied his application on October 21, 2016 and upon reconsideration on January 11, 2017. Mraz requested a hearing, which was held before an ALJ on July 19, 2018. In a written decision, the ALJ denied Mraz's

application for benefits.[1] The Appeals Council denied Mraz's request for review. He now seeks judicial review pursuant to 42 U.S.C. §405(g).

## III.  Background

### A.  Relevant Medical Evidence

#### 1.  Evidence related to Plaintiff's Physical Impairments

In March 2016, Plaintiff, who had a remote history of low-back surgeries in 1997 and 2008, underwent low-back surgery for three herniated discs, performed by orthopedic surgeon Douglas Musser, D.O. (ECF No. 11 at 967-69). On April 14, 2016, Mraz's lumbar MRI revealed a left sided laminectomy at L3/4 with broad based left sided disc protrusion and impingement of the exiting and traversing nerve roots on the left, bilateral laminectomies at L4/5 with mild narrowing, and recent left laminotomy at L5/S1 with mild impingement on the traversing left S1 nerve root. (ECF No. 11 at 447-48). Dr. Musser performed surgery on April 26, 2016 for Mraz's postoperative hematoma and radiculopathy. (ECF No. 11 at 445). In May, a low-back MRI showed moderate to severe degenerative disc disease at several levels, a small disc protrusion at the L4-5 level with possible impingement of the right L5 neural root, and postsurgical changes. (ECF No. 11 at 286, 337-38).

Dr. Musser's follow-up examinations in May and June showed normal findings, including normal gait, non-tender low back with pain-free range of motion, and intact strength and sensation in the legs, with no deficits. (ECF No. 11 at 881, 883, 885). Dr. Musser's office report dated June 1, 2016 noted that Mraz still had some occasional soreness in his back and his radiating leg

---

[1] The Transcript of Proceedings before the Social Security Administration is located at ECF No. 11.

symptoms had improved. (ECF No. 11 at 885). On June 8, 2016, Dr. Musser opined that Mraz could return to work on August 9, 2016. (ECF No. 11 at 480-81). In June, Dr. Musser prescribed physical therapy, which commenced that same month. (ECF No. 11 at 978-79).

At a follow-up with Dr. Musser in August, Plaintiff said he was doing okay overall and was making good progress with physical therapy; Dr. Musser noted some low-back tenderness, a straight leg raise test that was "moderately positive" on the left in the seated position but negative on the right, normal gait, and intact strength and sensation in the legs. (ECF No. 11 at 1080). On August 2, 2016, Dr. Musser's practice related that Mraz still had some soreness in his low back with intermittent discomfort radiating down both legs worse on the left. (ECF No. 11 at 1080). In September 2016, Mraz had another MRI, which revealed a fluid collection in the left paracentral region posterior to L5/S1, scar tissue extending through the laminectomy site and surrounding the descending S1 nerve root, and swelling. (ECF No. 11 at 1064).

In November, Plaintiff consulted pain specialist Shawn Donatelli, D.O. at Tiffany Pain Group, whose low-back findings included tenderness, muscle spasm, reduced range of motion, a straight-leg raise test positive on the left, normal muscle strength, and normal sensation. Dr. Donatelli also charted normal gait and normal inspection, range of motion, muscle strength and tone, and stability in the hips, thighs, knees, lower legs, ankles, and feet. (ECF No. 11 at 1063-64). During the examination, Mraz had a surgical scar, moderately diffuse tenderness, mild to moderate restriction of range of motion, absent Achilles reflex, and positive straight leg raising. (ECF No. 11 at 1063). Dr. Donatelli recommended a series of caudal epidural injections to treat Plaintiff's lumbar post-laminectomy syndrome, lumbosacral radiculopathy, lumbar degenerative disc disease, lumbar disc displacement, and lumbar sprain. (ECF No. 11 at 1051). Plaintiff

received his first injection in December. (ECF No. 11 at 1051-52, 1064). Relief lasted 24 hours but then returned. (ECF No. 11 at 1154). Plaintiff followed up with Dr. Donatelli in January 2017, reporting only 24 hours of significant relief from the caudal injection and not wanting any more. (ECF No. 11 at 1181). Dr. Donatelli noted unchanged findings and prescribed no medications, instead suggesting that Plaintiff consider a trial of neurostimulation, which he declined. (ECF No. 11 at 1175-77, 1179-80). At each of eight visits from November 2017 through May 2018, Dr. Donatelli noted unchanged findings and switched medications several times. (ECF No. 11 at 1151-77). Plaintiff reported in March 2018 that his medication regimen was providing satisfactory relief, although in April, he stated it was not as effective. (ECF No. 11 at 1154, 1157).

### 2. Evidence related to Plaintiff's Mental Impairments

Mraz was examined and/or treated by three medical sources with respect to his mental impairments.

In August 2016, Plaintiff presented to nurse practitioner Mary Hall of Serenity Center of Youngstown, reporting anxiety symptoms. Ms. Hall noted signs of mild depression and anxiety but also charted normal, coherent, spontaneous speech; appropriate, full-range affect; logical thought process; appropriate thought content; cooperative behavior; intact cognitive functioning, short- and long-term memory and ability to abstract and perform calculations; and fair insight. (ECF No. 11 at 1049). Dr. Muhannad Kassawat completed an evaluation of Mraz on October 24, 2016. (ECF No. 11 at 1046-48). Dr. Kassawat charted all normal findings including normal mood and no signs of anxiety or hyperactive or attentional difficulties. (ECF No. 11 at 1048). After completing his examination, Dr. Kassawat diagnosed Mraz with major depressive disorder recurrent moderate. (ECF No. 11 at 1048). Plaintiff followed up with Ms. Hall in November; she

4

noted all normal findings. (ECF No. 11 at 1081). The following month, Ms. Hall observed signs of mild depression and anxiety but otherwise noted normal findings. (ECF No. 11 at 1083).

Mraz continued counseling with Ms. Hall and treating with Dr. Kassawat regularly. In January 2017, Dr. Kassawat noted unchanged findings. (ECF No. 11 at 1086). At six subsequent visits from February through December, Ms. Hall and Dr. Kassawat consistently noted mostly normal findings, including normal, coherent, spontaneous speech; appropriate, full-range affect; logical thought process; appropriate thought content; cooperative behavior; intact cognitive functioning, short- and long-term memory and ability to abstract and perform calculations; fair to normal insight and judgment; and mood that was depressed at times but normal or euthymic at other times. At his last visit, on December 29, 2017, Ms. Hall noted that Mraz's "[b]ody posture and attitude convey an underlying depressed mood. Facial expression and general demeanor reveal depressed mood….There are signs of anxiety." (ECF No. 11 at 1100).

In October 2016, Mraz met with examining psychologist Kenneth Gruenfeld, Psy.D for a psychological evaluation. Dr. Gruenfeld noted that Mraz presented with good eye contact, sad appearance, appropriate affect and behavior, normal speech, good concentration, good insight and judgment, and no signs of anxiety. (ECF No. 11 at 1033-34). Plaintiff was "polite and respectful," answered all of the examiner's questions appropriately, "consistently remained on topic," elaborated when requested, and did not require any questions to be repeated; he recalled three of three objects after 15 minutes, recalled four digits forward but only two digits backwards, and completed serial 7 subtraction to 93. (ECF No. 11 at 1034-35). Dr. Gruenfeld diagnosed Mraz with depressive disorder and noted a determination to rule out cognitive disorder. (ECF No. 11 at 1036). Dr. Gruenfeld opined that Plaintiff could work effectively with others, was capable of

working in a timely manner but might work slower than others during depressive episodes, and appeared capable of managing at least a low-stress job setting, but might have worsening job performance if his stress worsened. (ECF No. 11 at 1035-36). Mraz's wife related that he had recent problems with sadness, focus, motivation, social isolation, and panic attacks.  (ECF No. 11 at 1035). Functionally, Dr. Gruenfeld opined that Mraz's issues of focus and motivation could impact his ability to consistently carry out future job tasks and his depression could worsen in times of stress with the quality and consistency of future job performance possibly worsening as stress worsens. (ECF No. 11 at 1035-36).

Plaintiff consulted psychiatrist Rajendra Koirala, M.D. in March 2018, at which time Dr. Koirala charted decreased concentration, increased psychomotor activity, moderately depressed mood, mildly-impaired short-term memory, cooperative attitude, appropriate affect, organized, logical thought process, good insight, normal judgment, normal thought productivity, and normal speech. (ECF No. 11 at 1193-194). Dr. Koirala diagnosed major depressive disorder, recurrent episode, moderate, and recommended counseling and medications. At monthly follow-up visits in April through June, Dr. Koirala noted normal findings except for anxious, depressed mood and, at the May exam, obsessive thoughts. (ECF No. 11 at 1197, 1199-1200, 1204-05). Dr. Koirala prescribed medications, recommended counseling, and made no changes in Mraz's diagnosis. (ECF No. 11 at 1197, 1200, 1205).

In June 2018, Dr. Koirala opined that Plaintiff had marked or extreme limitations in his ability to understand, remember, and carry out instructions, make judgments on complex work-related decisions, and interact appropriately with supervisors and the public. (ECF No. 11 at 1207-208). Dr. Koirala also opined that Mraz had mild to moderate limitations in his ability to interact

6

appropriately with co-workers and respond appropriately to usual work situations and changes in a routine work setting. (ECF No. 11 at 1208).

## B. Testimonial Evidence

Mraz testified at the administrative hearing on July 19, 2018. (ECF No. 11 at 40-61). At the time of the hearing, Mraz was 45 years old. He lived with his wife and small dog. He completed high school and 2 years of vocational training as a diesel technician. He was not working at the time of the hearing and relied solely on his wife for monetary support. For the 15 years prior to his claimed disability period, he had held several jobs including a delivery driver and warehouse worker, a tow motor operator, and a technician working on heavy and medium duty vehicles, construction equipment, and tractor trailers. Following an on-the-job injury in 1996, Mraz has undergone four back surgeries to repair damage associated with that injury. His most recent surgery was in April of 2016.

Mraz testified that he was unable to work due to the pain in his legs, the inability to sit, walk or stand for longer than 45 minutes, and the psychological impact of his injury and pain at only 45 years old. He testified that his pain is a "7" on average, which he tolerates. Mraz manages his pain through the help of a pain management center, medications, his physician, a chiropractor, and massage therapist. On good days he is able to clean, do laundry, take the dog for a 30-minute walk, and slowly mow his lawn. Typically, Mraz gets out of bed around 11 or 12. He spends around 2 hours total in his recliner in order to fight off dizzy spells and/or get relief from the pain or numbness. He is cautious about any exertions on his back; for example, he does not even pick up his 8-pound morkie. He suffers from depression and treats with a psychiatrist and medications.

Vocational expert Brett Salkin ("VE") also testified at the hearing. (ECF No. 11 at 61-78). The ALJ asked the VE to consider an individual of Mraz's age, education, and work history and assume that the individual "could occasionally lift and/or carry, including upward pulling 20 pounds; could frequently lift and/or carry, including upward pulling 10 pounds; the individual could stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday and sit with normal breaks for a total of about six hours in an eight-hour workday; pushing and pulling are unlimited, other than what was indicted for lifting or carrying. The individual could frequently climb ramps and stairs and frequently balance, occasionally stoop, kneel, crouch, crawl; never climb ladders, ropes and scaffolds and [ ] no manipulative, visual, communicative or environmental limitations. . . . The individual is limited to tasks that could be [ ] learned in 30 days or less; only occasional changes in work place tasks or duties, with any such changes being gradually introduced … and easily explained." (ECF No. 11 at 64-65). The ALJ referred to this as "hypothetical one". (ECF No. 11 at 67-68).

The VE testified that this individual would not be able to perform any of Mraz's former work, but that the individual could perform other jobs in the national economy. (ECF No. 11 at 65). In hypothetical two, the ALJ further limited hypothetical one to the individual being able to stand/walk four out of eight hours in a workday, the VE testified that there would still be significant jobs for such an individual. (ECF No. 11 at 68). In hypothetical three the ALJ further limited the hypothetical in that the "individual could occasionally lift and/or carry, including upward pulling, less than ten pounds. This individual could stand and/or walk with normal breaks for about two hours in an eight-hour workday and they can sit with normal breaks for six to eight hours in an eight-hour workday… occasionally climb ramps and stairs, balance, stoop, kneel,

crouch, crawl, never ladders, ropes and scaffolds." (ECF No. 11 at 68-69). The VE testified that this individual would not be able to perform any of Mraz's former work, but that the individual could perform other jobs in the national economy. (ECF No. 11 at 69). The ALJ then posed a fourth hypothetical with the individual in hypotheticals one, two and three "needing to alternate positions…every half hour for just a few minutes in the alternate position[.]" (ECF No. 11 at 70). The VE testified that that individual could not perform the jobs for hypothetical one but could perform the jobs existing for hypotheticals two and three. (ECF No. 11 at 70). The VE further testified that if the individual needed to alternate positions every 15-30 minutes, jobs from hypotheticals one and three would be eliminated, but jobs from hypothetical two would remain. (ECF No. 11 at 71).  If the individual needed to alternate positions more frequently than every 15 minutes, all jobs from hypotheticals one, two, and three would be eliminated. (ECF No. 11 at 71). Also, if the individual were off task more than 10 percent of the time on a regular basis, all jobs would be eliminated.

Each of the jobs listed by the VE required a reasoning level of 2 or 3. Mraz's counsel questioned the VE as to whether the jobs would still exist if the hypothetical individual's reasoning was at level 1. (ECF No. 11 at 75-76). The VE testified that no jobs would exist for the hypothetical person in number one or three (ECF No. 11 at 76); however, even with reasoning at level 1, jobs would exist for the hypothetical person in number two. Mraz's counsel further limited the hypotheticals by asking whether all employment would be precluded if the individual was determined to be "marked or extreme" in their ability to interact with the public, coworkers, or supervisors 33% of the time or less. (ECF No. 11 at 77).  The VE testified that no jobs would exist with such a limitation. (ECF No. 11 at 77).

### C.  Relevant Opinion Evidence

#### 1.  Dr. Musser

On June 8, 2016, Dr. Musser opined that Mraz could return to work on August 9, 2016. (ECF No. 11 at 480-81).

The ALJ assigned "little weight" to Dr. Musser's opinion because despite Mraz's history of back surgeries the opinion lacked any particular work limitations. Also, the ALJ stated that the ultimate opinion as to whether Mraz could return to work is an issue reserved for the Commissioner. (ECF No. 11 at 26).

#### 2.  Dr. Koirala

On March 5, 2018, Dr. Koirala conducted an initial psychiatric examination of Mraz and found that he had severe difficulty in getting around and participating in society and that he experienced moderate difficulties in understanding and communicating, self-care, getting along with people and daily living. (ECF No. 11 at 1194). Dr. Koirala diagnosed Mraz with Major Depressive Disorder, Recurrent Episode, Moderate. That diagnosis remained the same throughout his treatment. After treating Mraz for the three months, Dr. Koirala completed an assessment on June 18, 2018. (ECF No. 11 at 1207-1209). Based on the evaluation and treatment of Mraz, Dr. Koirala opined that Mraz had marked to extreme limitation in his ability to understand and remember complex instructions, carry out complex instructions, ability to make judgments on complex work-related decisions, and interact appropriately with supervisors. In addition, Dr. Koirala opined that Mraz had marked limitations in his ability to understand and remember simple instructions, carry out simple instructions, and interact appropriately with the public.

The ALJ gave Dr. Koirala's opinion "little weight" despite finding that he was an acceptable psychological source and a treating source. The ALJ explained that Dr. Koirala's opinion that Mraz had marked and extreme mental limitations is not supported by the record or his treatment notes which reflect only moderate symptoms and moderate limitations. (ECF NO. 11 at 27).

     3.  Dr. Gruenfeld

Dr. Gruenfeld opined Plaintiff could work effectively with others, was capable of working in a timely manner but might work slower than others during depressive episodes, and appeared capable of managing at least a low-stress job setting but might have worsening job performance if his stress worsened. (ECF No. 11 at 1035-36). Functionally, Dr. Gruenfeld opined that Mraz's issues of focus and motivation could impact his ability to consistently carry out future job tasks and his depression should worsen in times of stress with the quality and consistency of future job performance possibly worsening as stress worsens. (ECF No. 11 at 1035-36).

The ALJ assigned "some weight" to Dr. Gruenfeld's opinion finding that his assigned GAF score of 55 is consistent with Mraz's symptoms and conservative treatment. The ALJ also found that Dr. Gruenfeld failed to provide an opinion as to any specific mental limitations. (ECF No. 11 at 27). Additionally, the ALJ noted that Gruenfeld's opinion that Mraz may work slower than others in a depressive episode directly conflicted with his observation that Mraz's employment history shows that he is capable of working in a timely manner. (ECF No. 11 at 27).

     4.  Patrick A. Lalaha, D.C.

11

The state agency disability determination explanation lists the opinion of Dr. Lalaha on June 17, 2015 that Mraz can "lift up to 20 lbs frequently, up to 40 lbs occasionally. Occasional bend, squat, kneel, [and] climb." (ECF 11 at 90).

The ALJ gave Dr. Lalaha's opinion "little weight" as he is a chiropractor and, therefore, not an acceptable medical source entitled to controlling weight and "the opinion was provided about a year prior to the alleged onset date, and thus has little relevance in this case." (ECF No. 11 at 26-27). The ALJ also noted that the opinion mirrors Mraz's statement that the most he can lift is 40 pounds.

5.  State agency opinions

    i.  Drs. Mikalov and Klyop

Dr. Abraham Mikalov reviewed the file on July 26, 2016 and opined that Mraz could perform work at the light level of exertion. (ECF No. 11 at 96-97). Dr. Mikalov opined that Mraz could occasionally lift and/or carry (including upward pulling) up to 20 pounds and frequently lift and/or carry (including upward pulling) 10 pounds in an 8-hour workday. (ECF No. 11 at 96). Additionally, Dr. Mikalov opined that Mraz could stand, walk, and/or sit for about 6 hours in an 8-hour workday. (ECF No. 11 at 96). With respect to postural limitations, Dr. Mikalov opined that Mraz could never climb ladders/ropes/scaffolds and that he could occasionally stoop, kneel, crouch or crawl. (ECF No. 11 at 96).

Upon reconsideration on January 11, 2017, Dr. Gerald Klyop's opinion mirrored that of Dr. Mikalov. (ECF No. 11 at 112-13).

The ALJ assigned "some weight" to Drs. Mikalov's and Klyop's opinions finding that "[t]hey have specialized knowledge in evaluating physical impairments and the listings under the

SSA standards for disability." (ECF No. 11 at 26). The ALJ found that their opinions that Mraz could perform light work with postural limitations were generally consistent with the record. The ALJ noted, however, that the doctors failed to adequately consider Mraz's allegations of chronic pain, which are supported by the record and demonstrate that he cannot stand or walk the full 6 hours of an 8-hour workday.

### ii.  Drs. Savitscus and Warren

In October 2016, reviewing psychologist J. Savitscus, Ph.D., opined that Mraz had moderate limitations in his ability to carry out detailed instructions, his ability to maintain attention and concentration for extended periods, and his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (ECF No. 11 at 98). Dr. Savitscus opined Mraz could perform 1 to 3-step tasks in a routine environment without high pace or production requirements and could handle infrequent, easily explained changes in routine. (ECF No. 11 at 97-99). Dr. Savitscus also opined that Mraz had no significant social interaction limitations and was moderately limited in his ability to respond appropriately to changes in the work setting. (ECF No. 11 at 98-99). In December, reviewing psychologist V. Warren, Ph.D., offered an opinion identical to that of Dr. Savitscus (ECF No. 11 at 114-15).

The ALJ assigned "some weight" to the opinions of Drs. Savitscus and Warren. (ECF No. 11 at 26). The ALJ noted "[t]hey have specialized knowledge in evaluating mental impairments and the listings under the SSA standards for disability. However, they did not have the opportunity to review the updated record, and thus, their shared opinion was based on only about half the record." (ECF No. 11 at 26). The ALJ further stated that although their opinions that Mraz has no

more than moderate limitations in his mental functional domains is consistent with the record, Drs. Savitscus and Warren evaluated the claimant's case under the prior Listing 12.04(B) criteria, which changed in 2017, when they opined that "he has mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation." (ECF No. 11 at 26).

### IV.    The ALJ's Decision

The ALJ made the following paraphrased finding relevant to this appeal:

4. Mraz does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments. (ECF No. 11 at 22).

5. Mraz has the RFC to occasionally lift and/or carry (including upward pulling) 20 pounds, frequently lift and/or carry (including upward pulling) 10 pounds; stand and/or walk (with normal breaks) for a total of about 4 hours in and 8-hour workday; must periodically alternate sitting and standing, but no more than for a few brief minutes every ½ hour or so, while remaining on task or; not exceeding being off-task for equal to or greater than 10% of the time; push and/or pull (including operation of hand foot controls) is unlimited other than as shown for lift and/or carry; frequently climb ramps and stirs; and balance; occasionally stoop, kneel, crouch, or crawl; never climb ladders, ropes, and scaffolds; no manipulative visual, communicative, or environmental limitations; tasks that can be learned in 30 days or less; occasional changes in work place tasks or duties, with any such changes being gradually introduced and easily explained; and no tasks that involve high-production quotas, or fast-paced production demands, (e.g., assembly line production), but the individual is able to perform goal-oriented work (e.g., office cleaner). (ECF No. 11 at 24).

10. Considering Mraz's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform. (ECF No. 11 at 28).

Based on her findings, the ALJ determined that Mraz suffered severe impairments of degenerative disc disease of the lumbar spine with L5 and SI radiculopathy status post four back surgeries, post-laminectomy syndrome, obesity, and depressive/bipolar disorder. (ECF No. 11 at

21). The ALJ ruled out cognitive disorder as a medically determinable impairment. (ECF No. 11 at 22).[2] The ALJ further found that Mraz's medically determinable impairments could reasonably be expected to cause the alleged symptoms but that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (ECF No. 11 at 26).

Mraz argues that the ALJ erred by 1) failing to properly evaluate the opinion of Mraz's treating physicians; 2) failing to support her credibility determination by substantial evidence in violation of Social Security Ruling 16-3; and 3) failing to meet her meet her burden at Step Five of the Sequential Evaluation.

## V. Law & Analysis

### A.  Standard of Review

The Court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers* v. *Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept

---

[2] The ALJ ruled out "cognitive disorder" as a severe impairment stating that "the consultative psychological evaluator ruled out formally diagnosing him with having a cognitive disorder" and doing so "is supported by the record, as a review of the record shows that there is nothing in the record to support a formal diagnosis of cognitive disorder, such as alleged symptoms, actions/difficulties, results of the mental evaluation, or an event/condition that could possibly cause significant cognitive limitations." (ECF No. 11 at 22). The ALJ found "no objective medical evidence to document that this is a supported mental condition/impairment." (ECF No. 11 at 22). Although Mraz argues in his reply brief that he had been diagnosed with cognitive disorder (ECF No. 16 at 2), he does not raise a Step Two issue with respect to the disorder not being included in the list of severe impairments. Furthermore, Mraz had not, in fact, been diagnosed with cognitive disorder. The records indicate only that his treating psychiatrist noted it as a disorder to be "ruled out". (ECF No. 11 at 1036).

as adequate to support a conclusion. *Rogers*, 486 F.3d at 241; *Biestek* v. *Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("Substantial evidence supports a decision if 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' backs it up." (citing *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971))).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones* v. *Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek*, 880 F.3d at 783 ("It is not our role to try the case *de novo*." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen* v. *Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen* v. *Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers* v. *Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the

evidence and the result." *Fleischer* v. *Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter,* 78 F.3d 305, 307 (7th Cir. 1996); citing *Wilson* v. *Comm. of Soc. Sec.,* 378 F.3d 541, 544–546 (6th Cir. 2004) (finding it was not harmless error for the ALJ to fail to make sufficiently clear why he rejected the treating physician's opinion, even if substantial evidence not mentioned by the ALJ may have existed to support the ultimate decision to reject the treating physician's opinion)); *Shrader* v. *Astrue,* No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) (citing *Morris* v. *Sec'y of Health & Human Servs.*, 845 F.2d 326 (6th Cir. 1988) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.")). Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs* v. *Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).

1. Treating Source

Under the treating source rule, an ALJ "must" give a treating source opinion controlling weight if the treating source opinion is "well-supported by medically acceptable clinical and

laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Blakley* v. *Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2) (eff. to July 31, 2006)[3])). "It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent the with other substantial evidence in the case record." SSR 96–2p, 1996 WL 374188, at *2 (July 2, 1996). "If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544); *see also* 20 C.F.R. § 404.1527(c)(2) (eff. Aug. 24, 2012). The ALJ must weigh opinion evidence based on the "facts in each case" and "adjudicate[] [the claim] on its own merits based on a consideration of the probative value of the opinions." SSR 06-03p. The ALJ may consider six guiding factors: (1) the length and frequency of the relationship; (2) the opinion's consistency with other admitted evidence; (3) the opinion's supporting evidence; (4) the opinion's explanation; (5) the provider's specialty or area of expertise related to the individual's impairments; and (6) any other factors that tend to support or refute the opinion. SSR 06-03p. The ALJ need

---

[3] 20 C.F.R. § 404.1527(d)(2) was subsequently moved to 20 C.F.R. § 404.1527(c)(2). *See* 20 C.F.R. § 404.1527(c)(2)(eff. Aug. 24, 2012).

only consider the relevant factors; if she does so, and substantial evidence supports the weight she afforded to the evidence, then the ALJ's weight determination will stand. SSR 06-03p.

A.  Dr. Musser

On June 8, 2016, Dr. Musser opined that Mraz could return to work on August 9, 2016. Mraz argues that the ALJ's conclusion stemmed from her failure to give proper weight to the records and full opinion of Dr. Musser, which, Mraz argues, indicate that Dr. Musser had altered his June 8th opinion. On August 2, 2016, Dr. Musser noted that Mraz continued to have soreness in his low back with intermittent discomfort radiating down both legs and that another MRI may be necessary to check for possible recurrent disc herniation. Mraz argues that the ALJ erroneously failed to consider the August 2, 2016 notes as support for the "contention that Dr. Musser did not release Mraz to work as of August 9, 2016" as he had contemplated in June. Mraz argues that the existence of the follow up MRI in September indicates that Dr. Musser recognized Mraz's continued soreness and that he no longer believed that Mraz could return to work as he had previously opined.[4]  The Commissioner argues that there is no error because the opinion does not provide any specific work limitations and merely provides an opinion as to an ultimate issue reserved for the ALJ.

The ALJ assigned little weight to Dr. Musser's opinion rather than controlling weight stating that "[Dr. Musser] is an acceptable medical source and a treating source. However, he opined that the claimant could return to work on August 9, 2016, but the only reason he had not

_____

[4] The record of the September MRI is not included in the records from Dr. Musser, which include records from April 7, 2015 through June 1, 2016 (ECF No. 11 at 863 – 912) and then August 2, 2016 (ECF No. 11 at 1080). The September MRI is mentioned in the records of Dr. Donatelli at The Tiffany Pain Group as being ordered by Youngstown Orthopaedic Associates. (ECF No. 11 at 1064 and 1072).

been working was because he had undergone two back surgeries, and thus, could not work for a short period of time. Yet, despite the additional back surgeries, no particular work limitations were provided.  Also, in cases with this agency involving the question of the ability to work, such as in disability cases, the opinion of whether the claimant can work or not is an issue reserved for the Commissioner." (ECF No. 11 at 26).

Mraz appears to argue that the ALJ failed to consider Dr. Musser's notes of the August 2, 2016 as a subsequent opinion regarding his ability to return to work. However, this note does not have anything to do with Mraz's ability to return to work and does not mention any of the requirements for qualifying under the listing. Additionally, the note does not contain any relevant medical opinion and, therefore, the treating source rule is not applicable here. *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 505 (6th Cir. 2013) ("a treating physician's opinion is only entitled to such ... deference when it is a medical opinion.") (quoting *Turner v. Comm'r of Soc. Sec.*, 381 Fed.Appx. 488, 492–93 (6th Cir. 2010)). "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors—'[the ALJ's] decision need only 'explain the consideration given to the treating source's opinion.' " *Id*. (quoting *Turner*, 381 Fed. Appx. at 493 (quoting SSR 96–5p, 61 Fed. Reg. 34474)). "The opinion, however, 'is not entitled to any particular weight.'" *Id*. (quoting *Turner*, 381 Fed. Appx. at 493). Thus, even had the note contained an opinion on Mraz's ability to return to work that differed from the June opinion, that opinion is a conclusion for the ALJ to determine and is not a proper medical opinion. *See* 20 C.F.R. § 404.1527(d); *Johnson*, 535 F. App'x at 505.

The ALJ's decision to give little weight to Dr. Musser's opinion on Mraz's ability to return to work is supported by case law. Because Dr. Musser made no medical judgments and his opinion merely related to the ultimate issue as to whether Mraz could return to work "the ALJ had no duty to give such observations controlling weight or provide good reasons for not doing so." *Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007); *Mitchell v. Comm'r of Soc. Sec.*, 330 F. App'x 563, 569 (6th Cir. 2009) ("before the ALJ must apply the good reasons rule, there must be a genuine assertion by the treating physician of an opinion involving the claimant's 'symptoms, diagnosis, and prognosis.'" (citing 20 C.F.R. § 404.1527(a)(2)).

Despite, the ALJ having no duty to give Dr. Musser's opinion on when Mraz could return to work controlling weight and no duty to explain why she did not give it such weight, the ALJ appropriately explained why she accorded Dr. Musser's opinion little weight. Accordingly, there was no error.

B. Dr. Koirala

Dr. Koirala is a psychiatrist/physician who treated Mraz and is both an acceptable psychological source and a treating source. Dr. Koirala opined that Mraz had extreme limitation in his ability to understand and remember complex instructions and marked to extreme limitation in carrying out complex instructions, the ability to make judgments on complex work-related decisions, and his ability to interact appropriately with supervisors. In addition, Dr. Koirala opined that Mraz had marked limitations in his ability to understand and remember simple instructions, carry out simple instructions, and interact appropriately with the public.

Mraz argues the ALJ erred by failing to give Dr. Koirala's opinion controlling weight. The Commissioner argues that Dr. Koirala's findings were mostly normal and that his opinion that

Mraz suffered extreme or marked limitations is not supported by the record. The ALJ assigned little weight to Dr. Koirala's opinion rather than controlling weight finding that Dr. Koirala's opinion was not supported by the record including Dr. Koirala's own treatment notes, which reflect that the claimant had only moderate symptoms and only moderate limitations. (ECF No. 11 at 1190).

Typically, an ALJ "must" give a treating source opinion controlling weight so long as the treating source opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Blakley*, 581 F.3d at 406 (citations omitted). Here, the ALJ did not error by giving Dr. Koirala's opinion less than controlling weight.

During his initial assessment, Dr. Koirala noted that Mraz suffered with moderate difficulty understanding and communicating, getting along with people, and household life activities and severe difficulty in participating in society and getting around (ECF No. 11 at 1194) and charted some abnormal findings, including decreased concentration markedly diminished interest in activities, and depressed mood (ECF No. 11 at 1196). However, overall, Dr. Koirala found that Mraz's general disability score "indicates that he experiences moderate difficulties in daily living due to his mental health conditions." (ECF No. 11 at 1194). Upon examination of Mraz, Dr. Koirala noted cooperative attitude, appropriate affect, organized, logical thought process, good insight, normal judgment, normal thought productivity, and normal speech. (ECF No. 11 at 1193). Dr. Koirala noted Mraz's symptoms cause "clinically significant distress or impairment in social, occupational, or other important areas of functioning" (ECF No. 11 at 1196) and diagnosed Mraz with "Major Depressive Disorder, Recurrent Episode, Moderate" (ECF No. 11 at 1194). The notes

of the appointments thereafter indicate fluctuations in the severity of Mraz's symptoms but consistently described the severity of his depression as "moderate."

On May 22, 2018, however, Dr. Koirala noted "extreme anxiety" with symptoms of apprehension, feeling tense, racing thoughts, fear of physical illnesses, fears of disapproval, fear [that] something terrible is about to happen, tightness in the chest, butterflies in the stomach, restlessness, sweating not brought on by heat, feeling dizzy, smothering sensation, and feeling exhausted" and "moderate to severe depression" with symptoms including "feeling sad, crying spells, feeling hopeless, low self-esteem, feeling worthless, difficulty making decisions, loneliness, spending less time with friends, decreased motivation, loss of interest in activities, feeling tired, difficulty sleeping, changes in appetite, and worrying about his health." (ECF No. 11 at 1201). Dr. Koirala's diagnosis remained unchanged. (ECF No. 11 at 1203). The notes from the following appointment, June 15, 2018, again indicate that Mraz presented with continued symptoms of anxiety. Dr. Koirala rated the severity as "moderate" (ECF No. 11 at 1204), noted "[f]luctuations in symptom severity" (ECF No. 11 at 1205), and no change in the diagnosis. Dr. Koirala responded to the "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" three days later. (ECF No. 11 at 1207-1210).

Notably absent from Dr. Koirala's records is any support for his opinion that Mraz suffered extreme limitation in his ability to understand and remember complex instructions and marked to extreme limitation in carrying out complex instructions, the ability to make judgments on complex work-related decisions, and his ability to interact appropriately with supervisors. Accordingly, Dr. Koirala's opinion on June 18, 2018 that Mraz suffered marked or extreme limitations in those areas is not consistent with his own records.

Additionally, Dr. Koirala's opinion is inconsistent with the remainder of the medical records, which show no more than mild to moderate symptoms of depression or anxiety. For example, the records from each of the eleven examinations from August 2016 through December 2017 with Dr. Kassawat and Ms. Hall include normal findings in these areas, i.e. normal, logical thought process; appropriate thought content; cooperative behavior; intact cognitive functioning, short- and long-term memory and ability to abstract and perform calculations; and fair to normal insight and judgment.  Likewise, Dr. Gruenfeld noted almost entirely normal findings in these areas, including good concentration and good insight and judgment. Specifically, Dr. Gruenfeld stated that Mraz was "polite and respectful," answered all of the examiner's questions appropriately, "consistently remained on topic," elaborated when requested, and did not require any questions to be repeated; he recalled three of three objects after 15 minutes, recalled four digits forward but only two digits backwards, and completed serial 7 subtraction to 93. (ECF No. 11 at 1034-35).  Additionally, Dr. Gruenfeld noted that Mraz could work effectively with others. (ECF No. 11 at 1035-36).  Furthermore, Dr. Koirala's opinion is inconsistent with the opinion of the state agency reviewing psychologists, Drs. Savitscus and Warren who opined that Mraz had no significant social interaction limitations and was moderately limited in his ability to respond appropriately to changes in the work setting. (ECF No. 11 at 98-99, 115).

Accordingly, because Dr. Koirala's opinion was not supported by his medical notes and inconsistent with substantial evidence in the record, the Court finds that find that the ALJ did not error by not giving Dr. Koirala's opinion controlling weight.

That, however, does not end the inquiry. "If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency,

nature, and extent of the treatment relationship, …, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence,…, § 404.1527(c)(2)-(6)." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (internal citations omitted); "In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned." *Cole v. Astrue*, 661 F.3d 931, 938 (2011); § 404.1527(c)(2). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart*, 710 F.3d at 376 (quoting SSR No. 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). "This procedural requirement 'ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). The ultimate question is whether the Commissioner's decision is supported by substantial evidence and whether it was made pursuant to proper legal standards. *Cole*, 661 F.3d at 939.

Here, the ALJ's decision assigned "little weight" to Dr. Koirala's opinion and supported that determination both by the medical evidence in the record as a whole and by Dr. Koirala's own medical records specifically. Although substantial inconsistent evidence in the record alone is not enough (*Wilson*, 378 F.3d at 546), the ALJ also explained that Dr. Koirala's own records do not support his opinion of extreme limitations. Accordingly, the ALJ gave "good reasons" for according Dr. Koirala's opinion little weight.

C.  Dr. Lahala

Plaintiff's brief states that the ALJ erred by assigning his chiropractor's opinion "little weight" (ECF No. 13 at 12), but he fails to further address this error in his brief and, in fact, never mentions Dr. Lalaha by name. Accordingly, any argument relating to this alleged error is waived.

Even if not waived, however, the ALJ did not err. The state agency disability determination explanation lists the opinion of Dr. Lalaha on June 17, 2015 that Mraz can "lift up to 20 lbs frequently, up to 40 lbs occasionally. Occasional bend, squat, kneel, [and] climb." (ECF 11 at 90). Although the ALJ noted that the opinion mirrors Mraz's statement that the most he can lift is 40 pounds, she gave the opinion "little weight" as he is not an acceptable medical source and "the opinion was provided about a year prior to the alleged onset date, and thus has little relevance in this case." (ECF No. 11 at 26-27). A treating chiropractor is not "medical source" entitled to controlling weight and the ALJ has the discretion to determine the appropriate weight to accord chiropractor's opinion based on all evidence in record. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). During the hearing, Mraz testified that he did not lift his 8-pound dog or carry in the dog food. The state agency reviewing physicians opined that Mraz could carry 20 pounds occasionally and up to 10 pounds frequently. Ultimately, the ALJ agreed with the reviewing physicians and did not adopt the opinion of Lahala. Accordingly, the ALJ did not err in giving Dr. Lahala's opinion "little weight".

D.  Rheumatologist

Plaintiff also asserts that the ALJ failed to accord any weight to the opinion of the treating rheumatologist, thus resulting in harmful and reversible error. (ECF No. 13 at 17). Plaintiff does not address this issue further in his brief – even to mention the name of the rheumatologist. Accordingly, this objection is waived. Even if not waived, however, there are no records of a

rheumatologist in the transcript, nor any opinion that should have been considered. Accordingly, the ALJ did not err by not addressing the rheumatologist.

### 2. Step Three

The ALJ found that Mraz did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)". (ECF No. 11 at 22). Mraz argues that the ALJ erred in the Step Three analysis by failing to give proper weight to Mraz's treating source opinions and the medical record. The ALJ considered Mraz impairments under two listings: 1) Listing 1.04: Disorders of the Spine; and 2) Listing 12.04: Depressive, bipolar and related disorders.

### a.  Listing 1.04: Disorders of the Spine

Listing 1.04 addresses disorders of the spine such as herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture, which result in compromise of a nerve root (including the cauda equina) or the spinal cord. 20 C.F.R. § Pt. 404, Subpt. P, App. 1. To meet the listing requirements Mraz must demonstrate (in relevant part) "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]" 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 1.04(A).

Mraz argues that the ALJ erred in determining that Listing 1.04: Disorders of the Spine was not met or medically equaled because she gave improper weight to Dr. Musser and failed to

mention the September 2016 MRI. The Commissioner argues that the ALJ gave proper weight to Dr. Musser's opinion and that substantial evidence supports that he does not meet the requirements of the Listing. In determining that Mraz did not meet the requirements of Listing 1.04: Disorders of the Spine, the ALJ found that Mraz "does not have nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication." (ECF No. 11 at 22).

First, as discussed above, the ALJ did not err by giving little weight to Dr. Musser's opinion. Additionally, Dr. Musser's opinion did not include symptoms relating to the listing. Instead, Dr. Musser's opinion related to Mraz's ability to return to work, which is the ultimate issue for the ALJ to decide.

 Second, Mraz is correct that the ALJ did not mention the September 2016 MRI in her decision. However, an ALJ is not required to mention everything she considered. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). The "factual findings as a whole must show only that [she] implicitly resolved the conflicts in the evidence." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 438 (6th Cir. 2014) (citing *Loral Defense Sys.-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)). As explained further below, the September 2016 MRI did not show any symptoms in addition to those addressed in previous MRIs, and the medical record as a whole provides substantial evidence that Mraz does not meet the requirements of Listing 1.04.

To show that his impairment matches the listing, "claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Smith-Johnson v. Comm'r of Soc. Sec*., 579 F. App'x 426, 432 (6th Cir. 2014) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must

meet all of the specified medical criteria. An impairment that manifests only some of the criteria, no matter how severely, does not qualify.")).

Mraz has not met his burden. Mraz argues that the findings of the May 2016 and September 2016 MRIs are evidence of possible nerve root compression. The May 2016 MRI suggested the possibility of nerve root compression and, it appears, that the follow up MRI showed little change. However, the *possibility* of nerve root compression is not sufficient to meet the listing. Mraz argues that the ALJ failed to mention the September 2016 MRI which, he argues, supports the existence of nerve root compression.[5] The September 2016 MRI report states: "The previously seen a [sic] fluid collection in the left paracentral region posterior to the L5-S1 level is smaller and almost completely resolved on this exam. He [sic] remains evidence of scar enhancement that extends through the laminectomy site in particular surrounds the descending S1 nerve root on the left. There remains swollen appearance though slightly less than on the prior exam." (ECF No. 11 at 1064). As the Government points out, the words "nerve root compression" do not appear. It is unclear however, whether the evidence of a scar surrounding "the descending S1 nerve root on the left" supports a finding of nerve root compression. If the existence of nerve root compression is not supported by the September MRI, Mraz cannot demonstrate the existence of nerve root compression as the May 2016's statement regarding the *possibility* is not enough to meet (or medically equal) the listing requirement.

---

[5] Mraz also argues that the ALJ failed to mention the May 2016 MRI. This is inaccurate. The ALJ specifically discussed the May 2016 MRI. (ECF No. 11 at 25) ("an MRI taken in May 2016 showed multilevel moderate-to-severe degenerative disc disease and facet joint arthropathy as well as focal small right [paracentral] disc protrusion at L4-L5 (Exhibit lF/19)").

If, however, a scar extending through the laminectomy site and surrounding the descending S1 nerve root is indicative of actual nerve root compression, then the ALJ should have analyzed the remainder of the listing's requirements.

The Court need not resolve this question, however, because even assuming that the September 2016 MRI conclusively showed nerve root compression, Mraz has satisfied the remainder of the requirements: "neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04A; *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 415 (6th Cir. 2020) ("To succeed on his claim that his impairments match a listing, [claimant's] impairments 'must meet all of the specific medical criteria. An impairment that manifests only some of these criteria, no matter how severely, does not qualify.'" (quoting *Sullivan*, 493 U.S. at 530)).

Specifically, there is no evidence that Mraz had motor loss accompanied by sensory or reflex loss. The Government cites to examinations that show intact or normal leg strength and intact or normal reflexes, such as the August 2016 orthopedic examination by Dr. Musser (ECF No. 11 at 1080), and pain specialist Dr. Donatelli's eleven examinations from November 2016 through May 2018, which each included normal strength in the legs (ECF No. 11 at 25, 1071, 1152, 1155, 1159, 1161, 1163, 1167, 1170, 1173, 1176, 1179). Mraz did not refute this evidence nor direct the court to conflicting evidence in the record. Likewise, although the record indicates positive straight-leg raise tests, the tests did not indicate whether they were positive in both the seated and supine positions as the listing requires. (E.g., ECF No. 11 at 1080, 1155, 1167, 1170,

1176, 1179). Again, Mraz does not provide any record citations showing positive straight-leg tests in both the seated and supine positions.[6]

Accordingly, the record contains substantial evidence supporting the ALJ's conclusion that the listing was not met.

### b. Listing 12.04: Depressive, bipolar and related disorders

In determining that Mraz's depressive disorder/bipolar disorder did not meet or medically equal Listing 12.04: Depressive, bipolar and related disorders, the ALJ found Mraz's impairment did not meet the requirements in both 12.04(A) and (B) or 12.04(A) and (C). The ALJ thoroughly explained her considerations and analysis in reaching this conclusion. (ECF No. 11 at 22-24). Mraz argues that the ALJ's conclusion, however, stemmed from her failure to give proper weight to the opinion of Dr. Koirala and that the Commissioner's argument that his impairment did not meet the listing is merely "post hoc rationalization[.]"

To meet Listing 12.04, Mraz must show that he meets the requirements in both 12.04(A) and (B).[7] Under paragraph A, Mraz must show that his depressive order is characterized by five or more of the following: depressed mood; diminished interest in almost all activities; appetite disturbance with change in weight; sleep disturbance; observable psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or

---

[6] Although the Government argues that the state-agency physicians' finding that Mraz did not meet the listing supports the ALJ's conclusion, there is no indication that either of them reviewed the September 2016 MRI.

[7] Mraz does not challenge the ALJ's finding that he does not meet the requirements of paragraph C.

thinking; or thoughts of death or suicide. 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.04. There is no dispute that Mraz's displayed more than five of the symptoms in 12.04(A)(1).

Next, to satisfy paragraph B, Mraz must also show extreme limitation of one or marked limitation of two of the following: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; adapt or manage oneself. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.04(B). "A marked limitation may arise where several activities or functions are impaired or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652-53 (6th Cir. 2009).

The ALJ found that Mraz had moderate limitation in understanding, remembering, or applying information; moderate limitation in concentrating, persisting, or maintaining pace; moderate limitation in managing himself; and mild limitation in interacting with others.  (ECF. No. 11 at 22-23).

Mraz argues that Dr. Koirala's opinion supports that he meets the listing requirement of 12.04(B) by showing an extreme limitation of his ability to understand and remember complex instructions or, alternatively, by showing marked limitations in his abilities to carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with supervisors, and interact appropriately with the public. The Commissioner argues that the ALJ reasonably concluded that Plaintiff had no more than moderate limitations in any of the paragraph B criteria.

As addressed above, the ALJ reasonably accorded Dr. Koirala's opinion "little weight" as it was inconsistent with the remainder of the record and his own treatment notes. Moreover, substantial evidence supports the ALJ's conclusion that Mraz did not meet Listing 12.04.

i.   Understand, remember, or apply information (paragraph B1).

"This area of mental functioning refers to the abilities to learn, recall, and use information to perform work activities." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.00(E)(1). "Examples include: Understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions." *Id.*

The record supports the ALJ's determination that Mraz had moderate limitation in understanding, remembering, or applying information. The records from Serenity Center of Youngstown where Mraz treated for over a year, note signs of mild depression and anxiety while also charting normal, coherent, spontaneous speech; appropriate, full-range affect; logical thought process; appropriate thought content; cooperative behavior; intact cognitive functioning; short- and long-term memory; ability to abstract and perform calculations; fair to normal insight; and mood that was depressed at times but normal or euthymic at other times.

Dr. Gruenfeld noted that Mraz presented with good eye contact, sad appearance, appropriate affect and behavior, normal speech, good concentration, good insight and judgment, and no signs of anxiety. Dr. Gruenfeld further noted that Mraz was "polite and respectful," answered all of the examiner's questions appropriately, "consistently remained on topic,"

33

elaborated when requested, and did not require any questions to be repeated; he recalled three of three objects after 15 minutes, recalled four digits forward but only two digits backwards, and completed serial 7 subtraction to 93.

As previously discussed, even Dr. Koirala noted only decreased concentration, increased psychomotor activity, moderately depressed mood, mildly-impaired short-term memory, cooperative attitude, appropriate affect, organized, logical thought process, good insight, normal judgment, normal thought productivity, and normal speech. Dr. Koirala's also found only mild limitation in Mraz's ability to make judgments on simple work-related instructions.

Additionally, the ALJ supported her findings with Mraz's own testimony that he "can follow instructions, handle changes in routine, and handle stress, but worries about his future, has some issues with concentration/focus." (ECF No. 11 at 23). The ALJ also considered Mraz's testimony that he lacks focus and needs to look directly at people to interpret what they are saying to him. (ECF No. 11 at 23). She considered Mraz's testimony that "he forgets conversations that he has with people, tasks that he has completed, tasks that he has to complete, and is often distracted" and that "he forgets to return to tasks if he gets pulled away from something." (ECF No. 11 at 23).

Accordingly, the record supports the ALJ's determination that Mraz had moderate limitation in understanding, remembering, or applying information.

ii. Interact with others (paragraph B2).

"This area of mental functioning refers to the abilities to relate to and work with supervisors, co-workers, and the public." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.00(E)(2). "Examples include: cooperating with others; asking for help when needed; handling

conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness." *Id.*

The ALJ found that Mraz had a mild limitation in his ability to interact with others. Substantial evidence supports the ALJ's conclusion.

Dr. Koirala opined that Mraz had marked limitation in working with the public and supervisors, but mild to moderate limitation in working with coworkers and responding appropriately to usual work situations and to changes in routine work setting. The ALJ gave Dr. Koirala's opinion little weight as it was not supported by the record including his own treatment notes. For example, although Dr. Koirala opined that Mraz suffered marked limitation in this area, the only relevant notations in his records state that Mraz appeared with a cooperative attitude (ECF No. 11 at 1193), had a normal degree of social judgment (ECF No. 11 at 1194), and on one occasion, Mraz reported spending less time with friends and having a loss of interest in activities (ECF No. 11 at 1201). Although the DSM-5 assessment indicated that Mraz "endorsed severe difficulty" in participation in society, his DSM-5 scores was based on Mraz's answers and were not explained or detailed with equivalent severity elsewhere by Dr. Koirala. Additionally, the DSM-5 assessment also indicated moderate difficulty understanding and communicating and getting along with people. Furthermore, overall Dr. Koirala found that Mraz's general disability score "indicates that he experiences moderate difficulties in daily living due to his mental health conditions." (ECF No. 11 at 1190). As previously discussed, the ALJ did not err in giving Dr. Koirala's opinion little weight.

The ALJ also supported her decision with Mraz's own testimony in which he stated that he "goes grocery shopping with his wife. … He spends time with wife and parents.  He talks with others either by text, phone calls, or in-person visits.  He goes to church.  However, he does not spend much time with friends and reports he is not a 'fan of people.'" (ECF No. 11 at 23).  Dr. Gruenfeld also noted that Mraz "never had problems with co-workers and did not indicate that anger or aggression was a symptom of his depression. He was polite and respectful during his time in this office.  He answered questions and offered insight without conflict or arguing with the examiner. He also never spoke in a rude or aggressive tone of voice. He should be able to effectively work with others." (ECF No. 11 at 1035).

Accordingly, the ALJ's determination that Mraz suffered mild limitation in his ability to interact with others is substantially supported.

> iii. Concentrate, persist, or maintain pace (paragraph B3) and Adapt or manage oneself (paragraph B4).

Finally, the ALJ found that Mraz had moderate limitations in concentrating, persisting, or maintaining pace and in managing himself. Dr. Koirala made no finding of extreme or marked limitations in Mraz's abilities related to paragraphs B3 (concentrate, persist, or maintain pace) or B4 (adapt or manage oneself). And Mraz presents no other challenge to the ALJ's determination on the listings other than the weight of Dr. Koirala's opinion. Nonetheless, substantial evidence supports the ALJ's conclusion that Mraz suffers only moderate limitations in these areas.

Regarding Mraz's ability to concentrate, persist, and maintain pace, the ALJ considered Mraz's allegations about lacking focus, being easily distracted, and having difficulty refocusing to tasks. (ECF No. 11 at 23). However, as the ALJ noted, Mraz "exhibited good concentration" at

the consultative psychological evaluation, where he "consistently remained on topic" when answering questions, elaborated when requested, and did not require any questions to be repeated to him. (ECF No. 11 at 23). Further, Dr. Gruenfeld concluded that Plaintiff was "capable of working in a timely manner". (ECF No. 11 at 1035).

With respect to Mraz's ability to adapt and manage himself (paragraph B4), the ALJ noted that Mraz reported being able to handle changes in routine and handle stress and being able to engage in an array of daily activities to the extent his physical condition allowed, including preparing simple meals, doing laundry, driving, mowing the lawn, handling finances, caring for his dog, and performing self-care (ECF No. 11 at 23). Additionally, Plaintiff indicated having no problem with authority figures, told Dr. Gruenfeld that he never had problems with co-workers, and exhibited good insight into his depression.

Because the ALJ reasonably found that Mraz suffered only mild to moderate limitations in the paragraph B criteria, the ALJ did not err when she found that Mraz did not meet the requirements of Listing 12.04(B).

3.  Step Four

At Step Four, the ALJ must determine whether the claimant can perform his past relevant work in light of his RFC. To do so, the ALJ must first determine claimant's RFC, which is an indication of a claimant's work-related abilities despite his limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 416 .945(e). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.945(a), and

must consider all of a claimant's medically determinable impairments, both individually and in combination, SSR 96–8p.

Here, the ALJ found that Mraz had the RFC to:

> occasionally lift and/or carry (including upward pulling) 20 pounds, frequently lift and/or carry (including upward pulling) 10 pounds; stand and/or walk (with normal breaks) for a total of about 4 hours in an 8-hour workday, sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; must periodically alternate sitting and standing, but no more than for a few brief minutes every 1/2 hour or so, while remaining on task or, not exceeding being off-task for equal to or greater than 10% of the time; push and/or pull (including operation of hand foot controls) is unlimited other than as shown for lift and/or carry; frequently climb ramps and stairs, and balance; occasionally stoop, kneel, crouch, or crawl; never climb ladders, ropes, and scaffolds; no manipulative, visual, communicative, or environmental limitations; tasks that can be learned in 30 days or less; occasional changes in work place tasks or duties, with any such changes being gradually introduced and easily explained; and no tasks that involve high-production quotas, or fast-paced production demands, (e.g., assembly line production), but the individual is able to perform goal-oriented work(e.g., office cleaner).

(ECF No. 11 at 24).

Mraz claims that the RFC required additional limitations to account for his depressive disorder/bipolar disorder as well as the pain from his failed back surgeries. Mraz argues that the ALJ's hypothetical and subsequent RFC were not supported by substantial evidence and constituted harmful error in this matter. Mraz is incorrect.

First, the RFC accounts for Mraz's pain from his failed back surgeries. The ALJ explained both the medical and non-medical evidence that led to her concluded RFC. (ECF No. 11 at 25). In particular, the ALJ noted Mraz's post-surgical diagnoses of lumbar post-laminectomy syndrome to do his chronic pain following his four back surgeries. The ALJ discussed the finding of the January 2016 EMG study, which revealed a new left L5 radiculopathy and a persistent

chronic left SI radiculopathy. The ALJ also considered the May 2016 MRI which showed multilevel moderate-to-severe degenerative disc disease and facet joint arthropathy as well as a focal small right paranetral disc protrusion at L4-L5.[8]  Although Mraz testified at the hearing that he does not even lift his 8-pound puppy, the evidence in the medical records indicates he can, at times, lift a maximum of 40 pounds. Despite this evidence, the ALJ found it necessary to further limit the RFC to occasional lifting of up to 20 pounds and frequent lifting up to 10. Other record evidence indicated that Mraz could stand, walk, or sit for a maximum of 1 hour at a time and alternate between sitting and moving in order to relieve pain. During the hearing, Mraz testified that he could stand, walk, or sit for a maximum of 45 minutes before needing to alternate positions briefly to relieve pain. The ALJ further limited the RFC to allow Mraz to stand, walk, or sit for 30 minutes before needing to alternate positions. There is no indication in the record - including Mraz's own testimony - to support a need to alternate positions more frequently than designated in the RFC.

The ALJ also considered Mraz's level of pain and its effect on his ability to remain focused. Specifically, she explained that he was progressing well in physical therapy and despite still having discomfort, he was doing "okay". She explained that Mraz was able to perform activities of daily living, including mowing the grass, household tasks, and walking the dog. Additionally, the ALJ stated that the state agency physicians "did not adequately consider the claimant's allegations of chronic pain, as the record shows that his pain result in him not being able to

---

[8] The ALJ did not mention consideration of the September 2016 MRI. However, the September 2016 MRI did not contain any new information to be considered. Specifically, the MRI states that Mraz had scar tissue extending though the laminectomy site and surrounding the descending S1 nerve root. This same information existed in the May 2016 MRI, which the ALJ explicitly stated she considered.

stand/walk for the full 6 hours during an 8-hour workday. Likewise, the record shows that some changing of position is needed to relieve some pain." (ECF No. 11 at 26). The ALJ then included the following limitations, which exceeded the limitations of the state agency physicians: "stand and/or walk (with normal breaks) for a total of about 4 hours in an 8-hour workday, sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; must periodically alternate sitting and standing, but no more than for a few brief minutes every 1/2 hour or so[.]" Accordingly, there is sufficient evidence to support that the ALJ considered Mraz's pain when determining his RFC.

Second, the ALJ did not err by omitting a limitation based on Mraz's severe impairment of depression disorder/bipolar disorder in his RFC. In reaching her conclusion, the ALJ considered the opinion of examining psychologist Dr. Gruenfeld and reasonably according it "some weight". Dr. Gruenfeld opined that Mraz should be able to work effectively with others, was "capable of working in a timely manner" but might work slower than others during a depressive episode, and appeared capable of managing "at least" a low stress job setting but might suffer decreased job performance with worsening stress. The ALJ noted that Dr. Gruenfeld offered little or no specific functional limitations. As discussed above, the ALJ considered the opinion of Dr. Koirala and reasonably gave that opinion "little weight". The ALJ also reasonably accorded "some weight" to the opinions of reviewing psychologists Drs. Savitscus and Warren who each opined that Mraz could perform 1- to 3-step tasks in a routine environment without high pace or production requirements and handle infrequent, easily-explained changes in routine. The ALJ observed that the reviewers' opinions were consistent with the record as a whole, while noting that they had only reviewed about one-half of the record.

In support of the RFC, the ALJ explained:

> In regards to his depressive disorder/bipolar disorder, he reported of having a depressed mood, anxious mood, lack of energy, lack of motivation, sleep disturbance, crying jags, irritability, and mood lability as well as feeling hopeless and being overwhelmed by life (Exhibits 9F/2, and 18F/2, and 8).  At the consultative psychological evaluation, it was noted that his affect was appropriate to the situation during the clinical interview. He did appear sad during portions of the evaluation then discussing his medical history and lack of employment. He cited recent problems with sadness, poor self-worth, and social isolation. He did not endorse suicidal or homicidal thoughts, though (Exhibit 7F/4). The record shows that he has participated in individualized psychotherapy as well as medicinal treatment (Exhibit 18F).  Yet, he experiences no auditory hallucinations, visual hallucinations, paranoid thoughts, or delusional thinking (Exhibit 7F/4). Also, even though he has complained of symptoms, he also admitted to running out of medication (Exhibit 18F/8).  Furthermore, as discussed in the Part B Criteria section, the claimant is able to perform most of his activities of daily living on a mostly routine basis.

(ECF No. 11 at 25-26).

Looking at the decision as a whole, it appears that the ALJ considered Mraz's mental impairments and determined they did not require additional limitations in the RFC. Accordingly, there is sufficient evidence to support that the ALJ considered Mraz's mental impairments when determining his RFC.

4.  Step 5.

Having determined that "[Mraz's] impairment[s] prevent[] him from doing past work, the Commissioner will consider his RFC, age, education and past work experience to determine if he can perform other work. If he cannot perform other work, the Commissioner will find him disabled." *White* v. *Comm'r of Soc. Sec.*, 312 F. App'x 779, 785 (6th Cir. 2009) (citing 20 C.F.R. § 404.1520(f)). "The Commissioner has the burden of proof only on 'the fifth step, proving that there is work available in the economy that the claimant can perform.'" *Id.* (quoting *Her* v. *Comm'r*

41

*of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999)). "To meet the burden of showing that [Mraz] could perform work that is available in the national economy, the Commissioner must make a finding 'supported by substantial evidence that [Mraz] has the vocational qualifications to perform specific jobs.'" *Id*. (quoting *Varley* v. *Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). "This kind of '[s]ubstantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [Mraz's] individual physical and mental impairments.'" *Id*. (citations omitted in original).

First, Mraz argues that the ALJ's credibility determination was not supported by substantial evidence and violated SSR 16-3p. Second, Mraz argues that the ALJ did not meet her burden.

A. Creditability determination.

Substantial evidence supports the ALJ's credibility determination. When a claimant alleges symptoms of disabling severity, an ALJ must follow a two-step process for evaluating these symptoms. *See, e.g., Moore v. Comm'r of Soc. Sec.*, 573 F. App'x 540, 542 (6th Cir. 2014); *Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 821 (6th Cir. 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1); *see also* SSR 16-3p, 2017 WL 5180304 (S.S.A. Oct. 25, 2017).

In evaluating a claimant's symptoms, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. Beyond medical evidence, Social Security Ruling 16-3p sets forth seven factors that

the ALJ should consider. The ALJ need not analyze all seven factors but should show that she considered the relevant evidence. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005). The evaluation of a claimant's subjective complaints rests with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304*; see also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so."). While a reviewing court gives deference to an ALJ's credibility determination, "the ALJ's credibility determination will not be upheld if it is unsupported by the record or insufficiently explained." *Carr v. Comm'r of Soc. Sec.*, No. 3:18CV1639, 2019 WL 2465273, at *10 (N.D. Ohio April 24, 2019) (citing *Rogers*, 486 F.3d at 248-49), report and recommendation adopted by 2019 WL 3752687 (N.D. Ohio Aug. 8, 2019).

The ALJ found that Mraz's alleged symptoms satisfied the first step of the two-step test because "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms[.]" (ECF No. 11 at 26). However, at the second step, the ALJ found Mraz's statements about the severity of his symptoms to be "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (ECF No. 11 at 26). Here, the record supports the ALJ's determination.

The ALJ's decision thoroughly outlines the evidence she considered including Mraz's hearing testimony as well as his statements throughout the medical records and assessed the credibility of his statements in conjunction with the medical evidence. (ECF No. 11 at 22-23, 25-26).  Mraz's testified that he tries not to lift his 8-pound dog, that it is hard for him to bend down or kneel, and that his wife carries in the dog food.  (ECF No. 11 at 41). He stated that the most he can walk, stand, or sit is around 45 minutes at a time (ECF No. 11 at 50), the pain shots in his back did not really help and he started treating at a pain clinic where he has been prescribed "gentle, subtle" medications from which he has no side effects and is feeling relief, (ECF No. 11 at 51-52), and that he manages his pain with chiropractic and massage therapy. Mraz states that when he is on his medication he feels "real good" and can cut the grass or walk the dog. (ECF No. 11 at 52). Generally, he feels okay some days and others he does not, and he rates his average pain is a 7. (ECF No. 11 at 53). He is able to assist with house chores such as cleaning and laundry. Mraz stated that he could not sit in a chair for six to eight hours a day.

The ALJ also considered the conservative treatment Mraz tried with some benefit following his initial injury, such as physical therapy, aqua therapy, a TENS unit, injection therapy massage therapy, chiropractic treatment and NSAIDS. The ALJ considered Mraz's post-surgery physical therapy in 2016, which Mraz stated to Dr. Musser was progressing well. She considered that despite his complaints of remaining in pain, Mraz declined a trial of neurostimulation against his doctor's recommendation. The ALJ considered that his medication gives him relief from his depression and anxiety and he admitted to having symptoms after running out of medication.

As a whole, the ALJ's decision contains clearly articulated and specific reasons for the weight given to the individual's symptoms. SSR 16-3p, 2017 WL 5180304. The ALJ's assessment

of Mraz's credibility is supported by sufficient evidence in the record. This Court finds no reversible error in the ALJ's credibility determination.

B.  ALJ's Burden at Step Five

Although "[t]he claimant bears the burden of proof during the first four steps, [ ] the burden shifts to the Commissioner at step five." *Staymate v. Comm'r of Soc. Sec*., 681 F. App'x 462, 469 (6th Cir. 2017) (quoting *Wilson*, 378 F.3d at 548 (citation omitted). "At step five, the Commissioner must identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." *Id.*

Mraz argues that the ALJ's failed to meet her burden at Step 5 because the hypotheticals did not incorporate necessary limitations regarding his need to alternate positions more rapidly than every thirty minutes, his limitation to no more than occasional interaction with coworkers, the public, or supervisors, and the effect his pain would have on his ability to remain on task at least 90% of the time. (ECF No. 13 at 21-22). This argument fails here for the same reasons it failed at Step 4.

As explained above, substantial evidence supports the RFC. It was the ALJ's duty to determine what limitations to include in the hypotheticals, and she rightly included only the limitations she found supported by the record. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("[T]he ALJ can present a hypothetical to the VE on the basis of his own assessment if he reasonably deems the claimant's testimony to be inaccurate."); *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993) ("It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact.").

Accordingly, the court does not find error at Step Five.

## VI. Conclusion

In conclusion, the ALJ considered Mraz's entire record and found that the medical evidence supported the conclusion that Mraz was not disabled. The ALJ reviewed Mraz's claim under the five-step analysis set forth in 20 C.F.R. § 404.1520. Although the ALJ found that Mraz's "degenerative disc disease of the lumbar spine with L5 and SI radiculopathy status post four back surgeries, post-laminectomy syndrome, obesity, and depressive/bipolar disorder" were severe impairments, (ECF No. 11 at 21), and prevented Mraz from doing his past relevant work, the ALJ found that Mraz was not disabled because he was capable of performing other work that exists in significant numbers in the national economy. Substantial evidence supports the ALJ's conclusion.

## VII. Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Mraz's application for DIB be affirmed.

DATED: 10/13/2020

__*Carmen E. Henderson*_____
Carmen E. Henderson
United States Magistrate Judge

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States* v. *Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas* v. *Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).